## Tomlin v. Petty et al.
## Wright v. Same.

(Decided June 17, 1932.)

BLAKELY & MURPHY for appellants.

EDW. J. TRACY for appellees.

Opinion of the Court by Judge Thomas—Affirming.

In August, 1926, some 60 or more growers of cucumbers for pickling purposes entered into a voluntary arrangement which it is insisted in this record was the formation of a local pickle growers' association, the purpose of which was to insure more satisfactory prices to those entering into the arrangement. At the incipient meeting, between 20 or 30 growers were present, and it was held in the second story above the Bank of Independence, in Independence, Ky. It was called at the instance of Howard Stephens, who was the president of the bank and who was also a grower of cucumbers. Theretofore the agricultural product had been sold to parties in Cincinnati, Ohio, but there was general dissatisfaction at the prices obtained, and the object of the meeting was to devise plans, and, if necessary, to launch some kind of united sales project by and through which the low prices might be increased. To that end the former purchasers of the product in Cincinnati were invited and were present in person or by representatives, and when the crowd assembled, Stephens made himself chairman, and he appointed A. E. Petty, Dawson Bagby, and Leo Wilson, to the positions of what he called "trustees," and assigned to them their immediate duties. They were to confer with the Cincinnati parties and ascertain whether they would agree to increase the price of the involved product and to report back to the meeting; whereupon the trustees immediately performed that first assigned duty and immediately reported the result thereof.

It was unsatisfactory but its rejection was anything else except formal. Expressions of disapproval were given to it by Stephens, and perhaps a few others, in only a conversational manner, whereupon Stephens announced that they would form a sort of co-operative association if they could secure the services of one John Haubner, who possessed more or less expert knowledge in the pickle business, to accept the position as manager of the association. Whereupon Haubner was called over the telephone, who got out of his bed to answer the call, and an arrangement was made to meet him the next morning for a conference upon the subject, and which resulted in employing him as manager at $35 per week. The meeting was adjourned, after having been in session until something like 11 p. m., and, so far as the record shows, there was never another one until after the catastrophe

544

when the members of the association began to seek shelter from the threatening clouds.

The leading spirit, Stephens, conferred with his appointed trustees, and a location for the headquarters for the association was selected and equipped with vats and other necessary arrangements to receive and handle the product of the members of the association in a way and manner and with the effort to procure satisfactory prices, and to that end articles of agreement were drafted and copies were given to the three trustees for the purpose of obtaining signatures, resulting in about 60 producers signing them, two of whom were the appellants J. H. Tomlin and Charles Wright.

Omitting signatures, the agreement so executed reads:

"This agreement, entered into between the undersigned picklegrowers and A. E. Petty, Dawson Bagby and Leo Wilson, Trustees, witnesseth:—

"1. The undersigned picklegrowers do hereby appoint A. E. Petty, Dawson Bagby and Leo Wilson as Trustees and Sales Agents for the sale of all of the pickles produced by them during the year 1926, which have not been sold prior to this agreement.

"2. The said picklegrowers do hereby authorize the aforesaid Trustees to employ a manager and make all the necessary contracts, to take charge of all of the pickles delivered to them by the producers, to preserve and prepare them for the market, and to sell them for the best prices obtainable.

"3. The said Trustees agree that on delivery of pickles to them, a first payment shall be made according to the grade and quality of pickles delivered, and the amount paid each producer shall be the same as that paid to every other producer for the same grade and quantities, as follows:

| | |
|---|---|
| School size running from 175 to 200 | $ .75 per bu. |
| Large counts running from 300 to 400 | .35 per hundred |
| Medium counts running from 500 to 600 | .30 per hundred |
| Small counts running from 700 to 900 | .25 per hundred |
| Very small running from 1000 to 1500 | .20 per hundred |
| Cucumbers | .25 per bu. |

"4. The said Trustees shall also, on delivery of said pickles, give to the producer a receipt which shall clearly show the grades and quantities of pickles received.

"5. The said Trustees agree that after all of the pickles have been disposed of, they shall first deduct from the price received the total expenses of all kinds incurred by them by virtue of this contract and they shall then pay over all of the balance to the pickle growers in proportion to the prices for which the various grades of pickles were sold by them.

"In witness whereof, the parties hereto have subscribed their names this ——— day of August, 1926."

Upon that being done everything was in readiness to carry out the agreement for accomplishing the purpose of the adventure, except neither the alleged association nor the supposed trustees had a treasury, and, if they had possessed one, they did not have a cent in it. To overcome that obstacle Stephens had announced on the night of the meeting that he would stand by the association "till H——l froze over," and which frigid event was when the advancements would amount to as much as the law would permit to be made to a single borrower, and which it was thought in this instance was $10,000. So he designated Mr. Petty, one of the previously named trustees, to draw checks on his bank, indicating thereon that they were for the pickle growers' association, for whatever sums were necessary to meet the expenses incident to carrying out the agreement, the larger part of which was, of course, the advancements on first payments to be made to the growers upon the delivery and grading of their pickles or cucumbers, and pursuant thereto Petty issued checks executed in the suggested manner. Later Stephens requested that the three trustees execute notes for the amounts so advanced by the bank in cashing the checks, and the trustees readily consented thereto and suffered themselves to be led to that altar by executing the notes as requested to the bank. On the original ones, and on all renewals except the last one, their signatures were followed by the words "Trustees of the Pickle Growers Association." On the last renewal notes, aggregating some $7,500, the signatures of the trustees were not followed by such descriptive words; but it is quite conclusively proven that they were signed in blank for the purpose of renewing prior ones with the assurance from the cashier of the bank that he would fill in the amount of them to correspond with the old ones, and would also add the same words following the signatures of the trustees, but which latter he failed to do.

546

The cashier denied in his testimony any such agreement on his part, i. e., to write in the descriptive words following the names of the trustees, but the circumstances corroborate the testimony of the trustees in affirmance thereof, and so as to leave but little doubt as to the truth of their testimony upon that issue. However, that fact is not a material one on this appeal, and it is referred to only as a part of the history of the involved transactions.

Towards the first of the year, 1927, it became evident that by far the larger amount of pickles that had been produced by the arrangement agreed upon were those who entered into it, and which was emphasized when it appeared that the association had only about $70 of assets and owed about $7,500 at the bank, with perhaps smaller amounts to others. At that stage the trustees filed this action against the members of the association and asked for the appointment of a receiver to take charge of and wind up its affairs, and with the assets, including amounts that might be collected through available remedies in favor of the association (and its receiver succeeding to such rights), pay its debts to its creditors.

The motion for a receiver was sustained, and the appellee D. L. Adams was appointed and qualified. Thereafter he filed his intervening pleading in this case against all members of the association to whom advances had been made, as hereinbefore indicated, and sought to recover from each of them such amounts, aggregating about $4,500, and which he averred was due the association, or its "trustees", as agents for its members, as an expense incurred in carrying out their express directions, and in an effort to accomplish the purpose of the organization and the creation of such agency. Recovery was resisted on one ground common to all the cross-defendants, and which was, that the amounts sought to be so recovered by the receiver represented *payments* made to the defendants in such intervening and cross pleading as a part payment on the eventual sale price of the cucumbers that they delivered to the association, and that, in receiving such amounts, none of them incurred any contingent liability to return it or any portion of it. Some of such cross-defendants defended upon additional grounds, but they are not appellants here because the amounts sought to be recovered from them are too small to give this court jurisdiction. However, appellant Tomlin had been paid $545 and appellant Wright had

been paid $359.75, and the receiver recovered a separate judgment against them for such distinct amounts. Tomlin prosecutes a direct appeal from the judgment against him and Wright has filed a copy of the transcript and moved this court to grant him an appeal, and which motion is now sustained, and his appeal is granted.

It is argued by learned counsel for appellants (1) that the amount received by their clients from the association, upon delivery to the latter of the produce of appellants, was a pro tanto payment to them for which the law allows no subsequent recovery by the payor; and (2) that the trustees had no authority to borrow money from the bank, or any other person, and to thereby create a debt of the association. They will be disposed of in the order named.

1. Argument 1 necessarily proceeds upon the theory that the association purchased the pickles or cucumbers from the producers, and that they became the property of the association upon delivery according to the terms of the association agreement; but we are unable to agree with that contention. Neither the terms of the inserted agreement nor any action or conduct, taken or engaged in thereunder and as a consequence thereof, intimates or in any way implies that the association was organized for the purpose of *purchasing* the cucumbers or pickles from the members of the association who produced them. On the contrary, no other reasonable conclusion can be drawn from the terms of the agreement, or subsequent actions and conduct based thereon, than that the members of the association united themselves in a sort of co-operative fashion, but not under our statute, which, in part, was the selection of persons thought to be fit and competent for the purpose, and authorized them to do and perform the acts which they subsequently undertook, and all for the purpose of realizing a greater price for the produce of the members than they were then obtaining. The only logical and practical construction that may be given to such facts is that the alleged trustees, as representatives of the association and its members, were made the agents of the signers of the agreements (in which it is expressly so stated) with specific instructions and directions, a part of which consisted in the requirement that they (the agents) should advance to the members upon the delivery of their agricultural product to the association a designated proportion of the price that they expected to eventually realize for the same products

on final sale. The agents when such final sales should be made, were authorized to, "first deduct from the price received the total expenses *of all kinds* incurred by them by virtue of this contract and they shall then pay over all of the balance to the picklegrowers in proportion to the price for which the various grades of pickles were sold by them." (Our emphasis.)

In a former part of the agreement, and in section 2 thereof, the trustees were authorized to employ a manager and to make all necessary contracts for the carrying out of the enterprise, and in so carrying it out they were authorized "to take charge of all of the pickles delivered to them by the producers, to preserve and prepare them for the market, and to sell them for the best price obtainable." A part of the expenses incurred by the association, or the trustees who were made its directing representatives, consisted of the advancements made to the producers and which is sought to be recovered in this case, and it is too plain for discussion that such agents or trustees possess the right to an accounting from their principals, who in this case were the members of the association, and, if the aggregate expenses exceeded all assets that may have been furnished to the agent by the principal, or all income that may have been derived from the authorized enterprise, then on undisputed principles of equity the agents have the right to demand from the principal or principals such excess, subject, however, to the right of the latter to offset or rebut such demand by any legitimate claim against the agents. No such latter claim was interposed in this case and the record contains no such question.

In substantiation of the above statement, that the relationship of principal and agent was created under the involved arrangement, we refer to the text in 6 C. J. 1091, sec. 7, and to the annotations in 33 A. L. R. 253, and 47 A. L. R. 946, and cases therein discussed. This case does not present facts calling for a discussion of the relationship of bailments, or a distinguishing of the various types and kinds of bailments, further than to say that, at most, the involved one went no farther than to create the relationship of bailment with the power, authority, and direction to the bailee from the bailor to do the things specified in the agreement, one of which was to eventually sell the bailed property, and which the text in Corpus Juris, supra, as well as that in 21 R. C. L. 829, says does not take the title to the bailed property out of the bailor

and transfer it to the bailee. The relationship is simply one where the bailee is given the possession of the bailed property with the right, power, and authority to market and sell it, and to collect the price, and account to the bailor. In such an accounting, as we have said, the agent or bailee may charge and collect from his principal any item of expense that he was authorized to incur. See 21 R. C. L. 833, sec. 16, and 834, sec. 17. Also the text in 2 C. J. 739, sec. 407, and the cases of Hoskins' Admx. v. Morton, 85 S. W. 742, 27 Ky. Law Rep. 529; White v. Treadway, 52 S. W. 960, 21 Ky. Law Rep. 702; Ford Lumber Co. v. Arvine, 38 S. W. 137, 18 Ky. Law Rep. 711. It is therefore apparent that argument 1 is without merit and cannot be sustained.

2. Argument 2 must also share the same fate. It is, that the agents or trustees had no authority to borrow money. It is true that no express authority was given for that purpose in the signed agreement; but appellants expressly required them as representatives of the association to discharge certain duties, one of which was to pay to them the amounts that they collected and received, all with the knowledge on their part that neither they nor any of their associates had ever contributed one cent towards the creation of a fund from which such payments or other expenses could be made. Moreover, they are now insisting in another branch of this action (which is contained in this record as copied by the clerk) that Stephens, for his bank, agreed to advance the money to meet the necessary expenses, a part of which consisted in the amounts that appellants received. In their signed agreement appellants necessarily conferred authority upon their agents (the trustees) to procure the necessary funds from the bank, and which they knew could not be done, according to the ordinary method of conducting the banking business, except by executing some sort of paper evidencing the amount of money so drawn from the bank, and the fact that the obligation to the bank was eventually evidenced by the execution of notes cannot serve the purpose of relieving appellants, even if no specific authority was given to execute notes. Their liability would still remain, under the circumstances hereinbefore outlined, if no notes had ever been executed and the indebtedness to the bank was represented only by open account. The material fact creating their liability is that the indebtedness was incurred by their agents in carrying out their directions and instructions and in exercis-

ing the power and authority given to them in the executed agreement by appellants.

Summarizing and stating our conclusions in concrete form, we hold that it is doubtful if the meeting at the bank resulted in the actual formation of a distinct association. But, whether so or not, the agreement signed by appellants and others expressly created the trustees therein named the agents of each of them to do the things and perform the requirements therein specified, among which was to pay or advance to each subscriber a sum of money when they delivered their cucumbers to the place agreed upon. But they took no steps to supply their agents with the necessary funds for that purpose, and, in order to carry out that requirement the agents were compelled to expend their own money for that purpose, as well as for other purposes in carrying out the arrangement, or to obtain it elsewhere. They pursued the latter course which we think they clearly had the authority to do. In that event, as would also be true if they had advanced their own money, their principals who received that money became liable to them for any amount that the venture failed to realize, since the expenditure was one made by the agent for the benefit of the principal and upon the latter's direction, and the authorities, supra, sustain the right of the agent to recover it upon failure to obtain it from the proceeds of the enterprise.

There is no dispute as to the amount advanced to either of the appellants. It represents their proportionate part of a portion of the expenses that they authorized their agents to incur, and under every principle of equity known to us they should reimburse them, at lease to the extent of that amount. Whether they are liable to the creditors of their agent (the association or the trustees representing it) as partners, or members of a joint adventure, is a question that is not now before us. Neither is any other one, such as the personal liability of the trustees to the bank for the amount of the notes that they executed to it, and others contained in other branches of the case, but not presented on this appeal, and for which reason none of them will be discussed, nor any expression of opinion be made concerning them.

It is sufficient for the purposes of this appeal for us to determine, as we have done, that the judgments appealed from were and are proper, for the reasons hereinbefore stated, and they are each affirmed.